Good morning, Your Honor. My name is Steve Krupa, and I represent the Italian Jose Ahumada-Rodriguez. I told Mr. Ahumada, Your Honors, that this morning, on Mr. Ahumada's behalf, my argument focuses primarily on the focus of the sufficiency of the evidence argument, the denial of the defendant's Rule 29 motion. In that regard, I think it's important to first focus on the facts in this case, and what we know from the facts presented at trial, was that initially the investigation in this case focused on one, Yoel Anguiano. Mr. Anguiano was well known in the Vancouver Southwestern Washington area regarding marijuana growing and other drug trafficking organizations and schemes. Back in the July of 2009 time frame, the task force and DEA got a tip from a confidential informant that Mr. Anguiano was using a white Lincoln Town car to bring supplies and workers to a grow operation in the Southwestern Washington area. Surveillance again showed that the car, and the GPS showed that the car ended up in the house where the basis of the case occurred. That was in Northeast 158th and Vancouver. Again, it's important to understand that this house was owned by Mr. Anguiano. Subsequently, of course, a warrant was obtained and issued. The observation took place, the GPS observation, on 7-28. The warrant was obtained on 7-29. On that particular day at approximately 4-30 in the afternoon, task force agents arrived on the scene, knocked on the door, announced their presence in both English and Spanish. They didn't get any response. The door opened approximately four inches and then was immediately shut. Yes, isn't this exactly part of what is the evidence in support on an aiding and abetting theory at a minimum of your client's culpability? Well, I'm not sure that I follow you there, Your Honor. In aiding and abetting, I guess, yeah, if we move a step further, then in aiding and abetting the question would be who shut the door. And frankly, that's what I was going to get to next is when the police did enter the house, the testimony and the facts of the case that were listed at trial. He was the one standing closest to the front door upon entry. Well, he was in the middle of the living room. But among the defendants, wasn't he the one closest to the door? Yes. Okay. So why isn't it a reasonable inference that he was the one who slammed the door shut when the officers were trying to execute the warrant? Again, I mean, as far as whether it be a reasonable inference or not, it's not a reasonable inference because we have another person there as well as another person who was found in the house. All we have with regard to Jose Ahumada was his presence in the room. And again, he's not next to the door, Your Honor. There was never any testimony that Mr. Ahumada was next to the door. He was in the living room closest to the door. What does that mean? In a stash house filled with drugs where the door has just been slammed shut and bolt-locked by somebody inside, it means a lot, or it could mean a lot to a reasonable jury. It could, but then when we look at the case law and the status of the law in this particular district and what it's been for approximately 25 years, it's a high hurdle to show that this is anything more than a mere proximity argument. It doesn't matter that this was a stash house. Well, sure it does because it's one thing to slam the door if you have no idea that somebody has a tenth of a gram of something six rooms away, but that isn't this situation. I mean, the inference as to what a person knows and what they intend are quite different in those two settings, aren't they? What the person knows and what a person intends are quite different as to whether it would be a tenth of a gram, I suppose, or a stash house. But I would argue that there still needs to be something more to suggest that he did aid in a bet. And in that regard, I would say that we need to look at the rest of the evidence. And again, all we have is him in the middle of the living room and then we have a meager bedroll that was found in a wallet with approximately 400-something dollars. That's some false identification on a fair amount of money and cash. Are you referring to the $421? Right. I would suggest to you, Your Honor, as I argued in the court below, that $421 in small bills is not a lot of money, especially to an illegal immigrant who doesn't use a bank and was found in a wallet. Well, that's a permissible inference, but so is the other. I mean, when we're looking at sufficiency of the evidence, we give the benefit of the doubt to government when the person has been convicted and not the other way around. So the fact that there could be an innocent explanation doesn't really advance your argument unless that's the only permissible interpretation. Well, I think that when we look at aiding and abetting, as the government does know in their brief, we need to have essentially four things. We have to have some showing of the specific intent to facilitate commission of the crime, a requisite intent, and that's missing as well. I think, with respect, I think it's an impermissible leap there that the jury made in this particular circumstance, as well as the court not upholding the motion. There must be more evidence to show that Ahumada associated himself with this venture. Other than that, Your Honor, other than that being seen in the middle of the room, where is the other evidence? Well, what was in the bathroom? Your Honor, what was in the bathroom was the heroin. Yeah, and didn't he use the bathroom? Your Honor, when we look at the facts of the evidence, though, what it suggests is that the heroin was found in the Honda automobile. It was hidden in a compartment in the Honda automobile. When the police knocked on the door, the gentleman who was found closest to the bathroom was transferring the heroin from the Honda automobile into the bathroom in an attempt to flush it down the toilet. And I follow your – if I can go a little bit further there. I understand where you're going because I think the State talked about, well, the garage and the bathroom are common areas. But, again, Your Honor, there's no evidence that the heroin was in the bathroom other than that particular time when this fellow tried to flush it down the toilet. Well, now, wait a minute. It had all not been flushed down. There was some – how many bags were there in the bathroom? There were quite a few, and you're correct. Quite a few. They had not been flushed. Right. So a jury can infer they'd been there. It doesn't have to infer they were just put there. Well, I suppose they could, Your Honor, but, frankly, I don't know. Why not? And then your client, using that bathroom, was quite familiar with what was there and had control of it. With respect, Your Honor, I don't think that heroin sitting in the toilet would have been there. It would defy being there. No, it's not in the toilet. It's in the bathroom. All these bags of heroin are in the bathroom, right? They're on the floor and in the toilet, suggesting that they were brought in. How many are in the toilet? I don't have the exact number in front of me, Your Honor. And how many are on the floor? I don't have that either. But, again, they suggest, and they're the same packaging of the heroin that was in the car, that this heroin – and I think it makes sense that this heroin that was in the car was brought into the bathroom in an attempt to get rid of the heroin. Was there another door to bring it in? Sure. There was a door between the garage and the house, an internal door. So when they heard the knock on the door, somebody ran to the garage? I would suggest that that was Mr. Aguilar, Your Honor. I would suggest Mr. Aguilar went to the car and started grabbing bindles of heroin in an attempt to get rid of the bindles. And, sure, the question is, well, who slammed the door? If there was evidence, evidence that would be sufficient for a finding of guilt that Mr. Ahumada slammed the door, then I would agree that the government has a – well, I'm not going to say I would agree, but I would say that the government has a much stronger case in an aiding and abetting theory. And, Your Honor, when I talk about the state of the law here in this district, I look at the Chan case, and I know you wrote the dissent on – or the Tran, not Chan. Excuse me. I know you wrote – or you dissented on that. But look at all the other evidence in Tran, Your Honor, a significant amount of other evidence that tied Mr. Tran to drug dealing and that tied Mr. Tran to this particular transaction that came before Your Honor in the Court of Appeals. And even in that case, they found that there was an insufficiency of evidence to uphold the conviction of Mr. Tran. Your Honor, what we're talking about here, in my opinion, is a mere presence argument, a mere presence argument. That's what the state is – or the government here in this particular case is hanging their hat on, both a constructive possession argument as well as an aiding and abetting argument. And in that regard, let's not lose sight of the fact that there are no fingerprints found with regard to Mr. Ahumada anywhere. There was no statements given by any of the co-defendants that Mr. Ahumada was involved in drug dealing. By the way, that's different than what happened in the Tran case. There were no of the co-defendants, of course, pled attempted to withdraw their pleas. But their plea paperwork wasn't put into evidence here. There's a real lack of evidence other than this speculation that somebody slammed the door and that somebody was Mr. Ahumada. No, it's not speculative that somebody did it. You're right. It didn't happen by itself. I mean, you know, one can slam the door. It could be the wind, but it was bolt-locked from the inside. So it clearly was somebody. Right. And the only question on that score is whether a reasonable jury could infer that because your client was closest to the door, although not right next to it, but of the people in the house, he was the one closest to it, that he was the one who did so. It's not inevitable. So there's three people in the house, and you say one of them is transporting baggies from the garage. And then what's the other one doing? Do you know? The other gentleman, Your Honor, was standing next to Mr. Ahumada. These gentlemen were together in the middle of the living room. So the other gentleman was there as well. So we have the guy with the baggies. We have this other gentleman with Mr. Ahumada. There's no evidence that Mr. Ahumada, again, was right next to the door. These guys are in the living room. The door goes into the living room. And, Your Honor, I would just point out as well that I think you should put this in your calculations when you're looking at this. The significant amount of evidence that ties these other two fellows to this possession with intent crime, it's all them. There's documents in the car, money transfer documents in the car, linking these other two people. One of the fellows had his fingerprints, of course, on the drugs. Again, one of the gentlemen owned the car. That was Mr. Aguilar, who was the gentleman who was taking the heroin out there. Mr. Herrera-Perez, who was the gentleman next to Mr. Ahumada, had fingerprints on the heroin. Again, as I said, the money transfer documents concerning both Aguilar and Herrera were there. Again, what I'm trying to contrast here is when we look at the case law, the 25 years of case law, is that there was no other evidence linking Mr. Ahumada with drug trafficking. This is somewhat different than a lot of these other cases. In fact, the officers testified that Ahumada had never been on their radar. This was maybe a good score on the police officer's part, but it was an Anguiano investigation. Again, it appears to me that this court is focusing on aiding and abetting, but I would say that with respect, the fact that he's in the middle of the living room when he has another gentleman next to him doesn't suggest with enough weight, if you will, the proof behind the reasonable doubt. And that's what would be needed. I'd be happy to answer any other questions. If you'd like, you may save your remaining time for rebuttal. Very good. Thank you, Your Honor. Counsel, Your Honors, good morning. My name is Patricia Lawley, and I represent the United States of America. I was also the prosecutor in this case. The issue about whether there was sufficient evidence for a jury to find that Ahumada Rodriguez possessed or aided and abetted the possession of heroin is the answer is yes. Well, it's with intent to distribute, right? Exactly, Your Honor. So if it's an aiding and abetting theory, there has to be evidence from which one can infer that he was aiding not just the possession but the distribution as well. Absolutely, Your Honor. And what the evidence was about this case is that there was a stash house, and Ahumada Rodriguez was in that stash house. A house that was practically empty of furniture, of living room furniture, of bedroom furniture. This was a house that the expert DEA agent provided testimony to the jury that a casual visitor would not be invited to the stash house. And he explained why. He explained that you would have to be a trusted person to be allowed where there would be drugs, money, distribution materials. And where was Ahumada Rodriguez? Where was he and where were his belongings? His belongings were in the same room where residue-covered plastic was shown, was found, where a cutting agent was located, where a scale was located. Now, Your Honors, when the police came to the door to execute their search warrant and to knock and announce, that knock and announce period took a little bit of time. And there was substantial testimony that Sergeant Barnes, who was standing closest to the door, banged on the door, knocked and announced, yelled out, police were there. This was not early in the morning when occupants might be sleeping. This was in the afternoon. They repeated those same instructions in Spanish. And they did that more than once. Time elapsed. Sergeant Barnes tried the door, pried it open about four inches, and the door closed. He then repeated that measure, and this time the door was slammed closed and the deadbolt turned. Immediately the door was forced open, and the officer, Officer DeGroat, who was uttering directions in Spanish to the occupants, said that Ahumada Rodriguez was standing closest to the door. But he told us more than that. He told us that Mr. Ahumada Rodriguez was not compliant. His effort to slam the door shut and also his failure to be initially compliant is far different than the cases that Ahumada Rodriguez relies on. For example, the Vasquez-Chan case, where the housekeeper was in the kitchen when DEA agents approached the house. When they knocked on the door, she opened the door. She allowed them to come in. She was compliant. Her explanation for her presence there was as reasonable. Her innocent explanation was as reasonable as a non-innocent explanation. Here Ahumada Rodriguez cannot rely on that kind of analysis. His explanation for why he would be in a stash house, his explanation for why he would be closest to the door and not slamming the door. Now, I know that there was some discussion about where the heroin was located, and it was located in the common bathroom, a bathroom where Ahumada Rodriguez would be using because he was in the house. When police came in... But it did, I mean, on that score, I think it is a little questionable whether it appears reasonable to conclude that the heroin was being stored in the bathroom as distinct from being attempted to be destroyed when the warrant was executed. Was there any heroin in the kitchen, or was that all cocaine and cash and dryer sheets and all of that sort of stuff? When the police arrived, they noticed, and they photographed as well, two kitchen drawers that had loose currency, currency in a bag... Okay, could you just focus on my question?  There was no heroin, Your Honor, found in the kitchen. The jury could reasonably conclude that the open drawers, drawers that were opened when the police arrived, could have contained the heroin that was transported to the bathroom when they heard the police arrive. The reason why that conclusion might be more reasonable than the idea that one of the three men ran to the car in the garage to open up a secret compartment, which, by the way, was closed upon inspection. It was a canine that actually located or indicated the presence of narcotics in the vehicle. So the secret compartment of the car was locked in its locked position, whereas the drawers in the kitchen were left in the open position. A jury could have found that the heroin had been in the drawers, which were then transported. And that was a common area? It was a common area, yes. And where was it in the bathroom? Your Honor... Where was the heroin? There were 33... Where was the heroin in the bathroom? Yes, Your Honor. There were 33 bundles of heroin. Some of those bundles were around the toilet, and other bundles were in the toilet basin, which was no longer contained water. The jury could have inferred that some of the heroin actually was flushed, clogging the toilet, which is why there was no water in the toilet. Uh-huh. But could they infer it had been stored in the bathroom, or did they have to infer it was in the kitchen? Your Honor, given the state of the house and the fact that the two drawers were open, the fact that Ahumada, standing closest to the door, they could have inferred that he was trying to keep police out while the three occupants were trying to rid themselves of the heroin, which is why it was in the bathroom. Uh-huh. Your Honors, just to point out a few more details, the Valles-Valencia case says the sheer volume of drugs and the elaborate arrangements for their storage and transportation supports a jury finding that a defendant knowingly collaborated in possessing contraband. Here, the evidence was sufficient for a jury to find that Ahumada constructively possessed with the intent to distribute or aided and abetted the possession with intent to distribute. If Your Honors have no further questions of me. I don't believe that we do. Thank you. Thank you. Mr. Krupa, you have some time remaining. Thank you, Your Honor. Even Valles-Valencia requires something more. And let's talk about these empty drawers in the kitchen. The case law, all of the case law says that, especially Chan, that even knowledge of the heroin would not be enough. So let's just, for the sake of the argument, say that Mr. Ahumada knew that there was heroin in the house. And I think I make that, I talk about that in my brief. So he knows there's heroin in the house. There's got to be something more on either the constructive possession, or I think again what the Court is focusing on is the aiding and abetting theory, something more, some sort of intent to show that he was involved in this. And there's simply not that evidence. And what we have here is a mere presence argument. That's what we have. Who was the owner of the house? Mr. Anguiano was the owner of the house, Your Honor. Mr. Anguiano was the gentleman who they were focusing on. And again, Mr. Anguiano had, one of his things was taking people out to these grow-ups and having them work as basically field hands. I mean, one could infer that perhaps that was Mr. Ahumada's role, and that's why he was in the house. But we don't even need to go there because we need to have more to show that he aided and abetted and or constructively possessed. And again, even if he knew that. But what's your answer to about where the baggage came from? It's pointed out that the thing was locked in the garage, so it must have come from the kitchen. Well, again, the packaging was the same as the packaging that was in the car. And we're not talking, this is, as you know in these cases, these are these secret compartments where you press a button and the thing comes out. So it's unlikely it came from the car, isn't it? No, I'm not going to concede to that, Your Honor. I wouldn't say that it's unlikely. Well, can a jury reasonably infer that it came from a kitchen where there was heroin residue in some of the packaging, I think, that was found in the kitchen? I actually don't believe that that's totally correct. But even if they did infer that the heroin did come from the drawers, then let's extrapolate and say, well, then Mr. Ahumada must have known that the heroin was there. Well, does the knowledge of the heroin under the law in this district mean that Mr. Ahumada aided and abetted? And, again, the conclusion from the law, as far as I'm concerned, is no. We need something more. And we need intent. Government could give you the proper four requirements for aiding and abetting. We know somebody else was involved, but we have to have more to show Mr. Ahumada was involved. Thank you, counsel. We appreciate the arguments of both counsel. The case just argued is submitted.
judges: Noonan, Graber, Rawlinson